**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JAMEEL ROLLINS, | : | Civil Action No. 19-13390 (JMV) |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| JAMES SLAUGHTER, | : | |
| | : | |
| Respondent. | : | |

**VAZQUEZ, District Judge:**

Petitioner is a state prisoner currently incarcerated at East Jersey State Prison, in Rahway, New Jersey. He is proceeding *pro se* with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (D.E. 1.) For the reasons explained in this Opinion, the Court will deny the Petition and will not issue a certificate of appealability.

### I.   BACKGROUND

The New Jersey Superior Court Appellate Division summarized the underlying circumstances of this case on direct appeal:

> Just before noon on October 15, 2008, Mann was about to enter his BMW parked near his mother's home in Newark. Two men with ski masks approached carrying guns, and a third waited behind in a silver Lexus that "boxed in" Mann's BMW. Mann's mother returned home from grocery shopping to find the men "tussling" with her son. One of the men pointed a gun at her, and Mann continued to struggle with another, who twice struck him on the head with a gun.
>
> Mann believed that the men intended to force him into the Lexus, and his mother confirmed that she heard the men order him to "[g]et the fuck in the car." Mann was able to break free and ran as the assailants fired several shots at him, all of which missed. The men

drove off in the Lexus and Mann's BMW. A surveillance video from a nearby school captured much of these events and was shown to the jury at trial. Mann was later treated for a head wound requiring eight to ten stitches.

Sergeant Justin Marranca of the Union County Prosecutor's Office was driving along Routes 1 and 9 in Newark in an unmarked vehicle, when he heard a radio transmission describing the two cars. He spotted both traveling in tandem, about two hundred yards ahead, and began pursuing them. Apparently alerted to Marranca's presence, the cars began to rapidly accelerate. Marranca activated his lights and siren and followed as the cars entered an industrial area off Broadway in Jersey City.

As Marranca exited his vehicle and approached with his gun drawn, the cars quickly turned and headed toward him with the Lexus in the lead. Marranca aimed his gun at the unmasked driver of the Lexus as the car passed. Both vehicles swerved to avoid hitting Marranca as they sped out of the lot. Before the jury, Marranca identified Rollins as the driver of the Lexus.

Marranca continued to pursue the vehicles as they headed back toward Routes 1 and 9, but he eventually lost track of the Lexus. During the chase, both cars traveled at speeds of seventy miles per hour, weaved among lanes, and crossed into oncoming traffic. The BMW crashed, and Pierrevil was arrested as he tried to escape on foot. Two witnesses testified to seeing him toss a gun on top of a nearby building.

Shortly thereafter, the Lexus crashed into a vehicle driven by Jean–Mary. Officer Robert Turkowsky of the Kearny Police Department saw Rollins and another man escape from the front driver's side door of the Lexus. As he fled, Rollins threw an object into the river and was arrested after falling down a hill. The other man escaped and was never identified. Police later confirmed that the Lexus was reported stolen, and its owner so testified at trial.

Police also found a loaded .40 caliber handgun on the front seat of the Lexus, and a loaded .45 caliber Ruger handgun on the rooftop where witnesses had observed Pierrevil throw the weapon. Although no fingerprints were found on either gun, the State's ballistics expert opined that three spent .45 caliber shell casings found near Mann's mother's house were fired from the Ruger found on the roof. It was stipulated at trial that neither defendant had a permit to carry a handgun.

Neither defendant testified, and no defense witnesses were called.

*State v. Rollins*, No. A-2468-11T1, 2014 WL 4064784, at *2–3 (N.J. Super. Ct. App. Div. Aug.

19, 2014) (footnote omitted).  Ultimately, at trial

> the court accepted the jury's partial verdict that found defendants guilty of second-degree conspiracy to commit carjacking, *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:15–2 (count two); second-degree conspiracy to commit aggravated assault, *N.J.S.A.* 2C:5–2 and *N.J. S.A.* 2C:12–1(b)(1) (count four); second-degree eluding, *N.J.S.A.* 2C:29–2(b) (count eight as to Pierrevil and count nine as to Rollins); two counts of second-degree unlawful possession of a firearm, *N.J.S.A.* 2C:39–5(b) (counts eleven and fifteen); two counts of second-degree possession of a firearm for an unlawful purpose, *N.J.S.A.* 2C:39–4(a) (counts twelve and sixteen); two counts of third-degree receiving stolen property, *N.J.S.A.* 2C:20–7 (counts seventeen and eighteen); and two counts of third-degree resisting arrest by creating a risk of physical injury, *N.J.S.A.* 2C:29–2(a)(3)(b) (count nineteen as to Rollins and count twenty as to Pierrevil). The jury additionally found Rollins guilty of second-degree aggravated assault, causing or attempting to cause serious bodily injury ("SBI assault") to Mr. Jean–Mary, *N.J.S.A.* 2C:12–1(b)(1) (count ten). The jury could not reach a verdict on the remaining counts.
>
> Count three of the indictment charged both defendants with second-degree SBI assault of Mr. Mann. When the jury advised that it could not reach a unanimous verdict on this count, its foreman also advised that it had not considered the lesser-included assault offenses for which the judge had provided instructions. The judge accepted the partial verdict, but sent the jury back to deliberate on the lesser-included offenses under count three. After a brief period of further deliberations, the jury advised that it could not reach a unanimous verdict on the lesser-included offenses.

*Rollins*, 2014 WL 4064784, at *1.  Additionally, the jury was unable to reach a verdict on Count

One, first-degree carjacking, contrary to N.J. Stat. § 2C:15-2; Count Five, first-degree attempted

murder, contrary to N.J. Stat. §§ 2C:5-1, 2C:11-3; and Count Six, first-degree attempted

kidnapping. (D.E. 4-6, at 3–5; D.E. 4-15, at 8–9.)  The court sentenced Petitioner to an aggregate

term of forty years with a thirty-year and six-month period of parole ineligibility. (D.E. 4, at 2; D.E. 4-6.)

The Appellate Division dismissed Petitioner's conviction under Count Ten for second-degree aggravated assault against Jean-Mary but affirmed the remainder of Petitioner's convictions. *Id*. at *2.  On remand, the trial court re-sentenced Petitioner to the same aggregate term of forty years with a thirty-year and six-month period of parole ineligibility. (D.E. 4-55.) Thereafter, the Supreme Court of New Jersey denied Petitioner's petition for certification. *State v. Rollins*, 108 A.3d 633 (2015).

Petitioner then filed a petition for post-conviction relief ("PCR"), and the PCR court denied the petition.  *State v. Pierrevil*, No. A-3198-15T4, 2018 WL 1004063, at *1 (N.J. Super. Ct. App. Div. Feb. 22, 2018).  The Appellate Division affirmed on PCR appeal, *id*. at *2–3, and the Supreme Court of New Jersey denied Petitioner's PCR petition for certification.  *State v. Pierrevil*, 197 A.3d 664 (N.J. 2018).

Petitioner filed the instant Petition in June of 2019. (D.E. 1.)  Respondent filed an Answer opposing relief, (D.E. 4), and Petitioner did not file a reply.  Petitioner raises the following claims in his Petition:

> 1.     Petitioner's 6th Amendment right to a fair and impartial jury, and his 5th and 14th Amendment constitutional rights to due process and equal protection of the laws were violated; since his convictions should have been vacated, and the matter remanded for a new trial because Petitioner sustained his burden of proving that the state exercised peremptory challenges to exclude potential jurors based on race. (D.E. 1, at 23.)
>
> 2.     Petitioner's 5th and 14th Amendment rights to due process and his right to equal protection of the laws were violated since Officer Marranca's identification of Petitioner should have been suppressed because the procedure was impermissibly suggestive

and resulted in a very substantial likelihood of irreparable misidentification. (*Id*. at 26.)

3.      Petitioner's 8th Amendment rights against cruel and unusual punishment and his 5th [and] 14th Amendment rights to due process and equal protection of the laws were violated because the trial court abused its[] discretion in sentencing Petitioner to an aggregate term of 40 years with 30.5 years of parole ineligibility; since a proper analysis of the aggravating factors does not support such a sentence. (*Id*. at 28.)

4.      Pursuant to New Jersey State Supreme Court jurisprudence Petitioner  should not have received three consecutive sentences, consequently, the sentencing court erred in violation of Petitioner's 8th Amendment  constitutional protection against cruel and unusual punishment, and in violation of his 5th and 14th Amendment due process rights . . . [and right to] equal protection of the laws. (*Id*. at 29.)

5.      In violation of Petitioner's  5th and  14th Amendment constitutional rights to due process, with equal protection of the laws, and also his 6th  Amendment right to a fair and impartial trial, the court erred in taking a final partial verdict and then sending the jurors back to consider lesser included offenses that had been skipped in deliberations. (*Id*. at 30.)

6.      Petitioner's 5th and 14th Amendment rights to due process with equal protection of the laws were violated because the State presented insufficient evidence to prove a conspiracy to carjack. (*Id*. at 32.)

7.      Petitioner's 6th Amendment right to effective counsel was violated because the inadequate representation that Petitioner received at trial fell below an objective reasonable standard; thus violating his rights to effective assistance of counsel guaranteed by the United States Constitution. (*Id*. at 34.)

      a.   Trial counsel was ineffective for failing to conduct any meaningful adversarial challenges to the State's evidence. (*Id*.)

5

    b.   Trial counsel was ineffective for failing to cross examine key witness Mr. Ahmad Mann in this case. (*Id*.)

    c.   Trial counsel was ineffective for failing to investigate Mr. Mann's prior cooperation with law enforcement. (*Id*.)

    d.   Trial counsel was ineffective for failing to excuse for cause jurors number 6 and 351 after it was revealed that the jurors thought Petitioner looked familiar to them and also knew the same people. (*Id*.)

    e.   Trial counsel was ineffective for failing to communicate to Petitioner a favorable plea. (*Id*.)

8.    Petitioner's 6th Amendment rights to effective counsel were violated by his direct appeal attorney who failed to show how his 14th Amendment rights to due process and equal protection of the laws were also violated by the trial court. (*Id*. at 35.)

9.    Because the Appellate Division on direct appeal reversed count ten of the indictment, Petitioner should have been afforded a new sentencing hearing pursuant to *State v. Yarbough*, 100 NJ 627 (1985).  Because the sentencing court utilized the fact that there were multiple people in it[s] rationale for imposing consecutive sentences. Failure to afford such a hearing has violated Petitioner's 5th and 14th Amendment constitutional rights to due process and equal protection of the laws. (*Id*. at 37.)

10.    The Petitioner was never appr[ised] of the range of penal consequences he faced if convicted, which violated his 6th Amendment right to effective counsel, and also his 5th and 14th amendment  due process  and equal protection rights protected by the United States Constitution. (*Id*.)

11.    Petitioner's 6th Amendment rights were violated as trial, and appellate counsel were ineffective for failing to raise prosecutorial misconduct in the presentation of the case to the grand jury, which was also in violation of both his 5th and 14th Amendment rights to due process and the equal protection of the laws; because said presentation was grossly misleading and/or omitted clearly exculpatory evidence. (*Id*. at 39.)

## II.     STANDARD OF REVIEW

Section 2254(a) permits a court to entertain claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioners have the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  Under § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts in habeas cases must give considerable deference to the determinations of state trial and appellate courts.  *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  AEDPA deference also applies when there has been a summary denial. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) (citation omitted).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [Supreme Court's] decisions," as of the time of the relevant state-court decision.  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))).  "Under the contrary to clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of

materially indistinguishable facts." *Williams*, 529 U.S. at 412–13 (internal quotation marks omitted). As to § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen*, 563 U.S. at 180–81.

Where a petitioner seeks habeas relief pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "fairly present all federal claims to the highest state court before bringing them in a federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365–66; *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999). Federal courts may not excuse a

8

procedural default and grant relief unless (1) the petitioner establishes "cause" to excuse the default and actual "prejudice" as a result of the alleged violation of federal law; or (2) the prisoner demonstrates that failure to consider the claim will result in a fundamental "miscarriage of justice." *Leyva*, 504 F.3d at 366; *see also Coleman v. Thompson*, 501 U.S. 750 (1991).

A court may, however, elect to *deny* a procedurally defaulted and/or unexhausted claim on the merits under 28 U.S.C. § 2254(b)(2). *Osorio v. Anderson*, No. 17-1536, 2020 WL 206000, at *4 (D.N.J. Jan. 14, 2020) (citing *Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005)).  In that scenario, if a claim did not receive an adjudication from the state courts on the merits, a federal habeas court must review the claim *de novo*. *See Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009).

## III.   ANALYSIS

### A.   Jury Related Claims

#### a.   *Batson* challenge

In Ground One, Petitioner contends that the trial court should have stricken the empaneled jury or dismissed the indictment due to the prosecutor's misconduct during jury selection.  (D.E. 1, at 23–26.)  Petitioner argues that the prosecutor used five peremptory challenges based on race, to remove African Americans from the jury.  (*Id*. at 24.)

On habeas review, a district court must review the last reasoned state court decision on each claim.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on direct appeal.  The Appellate Division denied the claim as follows:

> During the third week of jury selection, defendants objected after the prosecutor exercised his first four peremptory challenges to remove African–American women from the jury. At that point, the seated jury included four African–American jurors out of sixteen.

9

Concluding that defendants had demonstrated *prima facie* conduct by the prosecutor to exclude jurors based upon their race, the judge required the prosecutor to explain his decision to utilize the challenges.

The prosecutor explained his reasons for excusing all four jurors, noting that he believed one was not African–American and another was noticeably pregnant. The judge concluded that "[n]one of the reasons the prosecutor ha[d] given [we]re suggestive that these challenges were for any improper reason." Indeed, the judge agreed that one of the jurors was not African–American, and he voiced concerns that the pregnant juror would be uncomfortable, since jury selection had already extended for three weeks, and the trial itself was likely to be quite long.

The judge revisited the issue when the prosecutor next requested that an African–American male juror be excused for cause, explaining the juror's responses to *voir dire* questions were "fantastical," shifting and designed to satisfy counsel rather than to provide honest information. The judge declined to excuse the juror for cause, so the prosecutor exercised another peremptory challenge. At sidebar, the judge again reviewed the prosecutor's reasons for exercising the challenge, and noted that the juror's answers perhaps reflected negatively on his ability to fairly evaluate the testimony.

The following day, the prosecutor told the judge that a criminal background search conducted on one of the empaneled jurors, an African–American woman, revealed a prior arrest, but no conviction, for possession of a controlled dangerous substance. The juror had stated during *voir dire* that she had never been accused of any criminal offense. The prosecutor requested that she be stricken for cause.

Defense counsel renewed their objections and moved to strike the empaneled jury and the remaining venire, or dismiss the indictment. The judge denied the motions, and, after questioning the juror, concluded she had been arrested and had not honestly answered the *voir dire* questions. He struck her for cause.

Before us, both defendants argue that the prosecutor improperly used his peremptory challenges to exclude potential jurors from the panel on the basis of race. We disagree.

The State's use of peremptory challenges to exclude potential jurors on the basis of race violates the federal and State constitutional

rights of a criminal defendant. *See Batson v. Kentucky,* 476 *U.S.* 79, 106 *S.Ct.* 1712, 90 *L. Ed.*2d 69 (1986); *State v. Gilmore,* 103 *N.J.* 508, 521–24 (1986). The Court has adopted "a three-step process [that] must be employed whenever it has been asserted that a party has exercised peremptory challenges based on race or ethnicity." *State v. Osorio,* 199 *N.J.* 486, 492 (2009).

Step one requires that, as a threshold matter, the party contesting the exercise of a peremptory challenge must make a *prima facie* showing that the peremptory challenge was exercised on the basis of race or ethnicity. That burden is slight, as the challenger need only tender sufficient proofs to raise an inference of discrimination. If that burden is met, step two is triggered, and the burden then shifts to the party exercising the peremptory challenge to prove a race- or ethnicity-neutral basis supporting the peremptory challenge. In gauging whether the party exercising the peremptory challenge has acted constitutionally, the trial court must ascertain whether that party has presented a reasoned, neutral basis for the challenge or if the explanations tendered are pretext. Once that analysis is completed, the third step is triggered, requiring that the trial court weigh the proofs adduced in step one against those presented in step two and determine whether, by a preponderance of the evidence, the party contesting the exercise of a peremptory challenge has proven that the contested peremptory challenge was exercised on unconstitutionally impermissible grounds of presumed group bias. [*Id.* at 492–93.]

The judge must make specific findings as to the reasons for each challenge, and whether the challenges were exercised on improper grounds. *State v. Clark,* 316 *N.J.Super.* 462, 473 (App.Div.1998), *appeal after remand,* 324 *N.J.Super.* 558 (App.Div.1999), *certif. denied,* 163 *N.J.* 10 (2000). On review, we accord "substantial deference" to the trial court's findings of fact in this regard. *Ibid.*

Here, the judge promptly scrutinized the contested peremptory challenges, made the requisite particularized findings of fact, and reached his conclusions, having had the unique opportunity to observe the circumstances first-hand. To be sure, the judge may have frequently stated that the prosecutor's proffered reasons were "race neutral." Defendants correctly point out that the proper inquiry is not merely whether the reasons were facially neutral, but rather whether a defendant has demonstrated a likelihood that those facially neutral reasons are pretextual. *Gilmore, supra,* 103 *N.J.* at 538. However, a thorough review of the entire record convinces us that the judge properly applied the three-part *Osorio* test, including

> the critical weighing process in stage three, and we find no basis to
> overturn defendants' convictions on these grounds.

*Rollins*, 2014 WL 4064784, at *3–5 (alterations in original) (footnote omitted).  Here, the state

court's decision was not contrary to, or an unreasonable application of, clearly established federal

law.

As the Supreme Court has held, the Equal Protection Clause of the Fourteenth Amendment

forbids a prosecutor from challenging "potential jurors solely on account of their race or on the

assumption that black jurors as a group will be unable impartially to consider the State's case

against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  The Supreme Court has

set forth a three-step analysis for a *Batson* challenge:

> First, the trial court must determine whether the defendant has made
> a *prima facie* showing that the prosecutor exercised a peremptory
> challenge on the basis of race. Second, if the showing is made, the
> burden shifts to the prosecutor to present a race-neutral explanation
> for striking the juror in question . . . . Third, the court must then
> determine whether the defendant has carried his burden of proving
> purposeful discrimination. This final step involves evaluating "the
> persuasiveness of the justification" proffered by the prosecutor, but
> "the ultimate burden of persuasion regarding racial motivation rests
> with, and never shifts from, the opponent of the strike."

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (citations omitted).

Under step one, to establish a *prima facie* case a defendant must show that "the totality of

the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545

U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93–94).  A defendant may proffer evidence that

the State exercised a pattern "of strikes against black jurors included in the particular venire,

[which] might [then] give rise to an inference of discrimination." *Williams v. Beard*, 637 F.3d 195,

214 (3d Cir. 2011) (alterations in original) (quoting *Batson*, 476 U.S. at 97).  Additionally, "the

prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Id.*

As to step two, the State's burden of production is relatively low; "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 215 (quoting *Purkett v. Elm*, 514 U.S. 765, 768 (1995) (per curiam)). Moreover, although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it is sufficient. *Purkett*, 514 U.S. at 767–68.

Finally, under step three, a defendant must show that "it is more likely than not that the prosecutor struck at least one juror because of race." *Hairston v. Hendricks*, 578 F. App'x 122, 130 (3d Cir. 2014) (quoting *Bond v. Beard*, 539 F.3d 256, 264 (3d Cir. 2008)). This step "involves an evaluation of the prosecutor's credibility, and the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenges." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (alteration in original) (citation omitted) (internal quotation marks omitted). At this stage, a court must consult "all of the circumstances that bear upon the issue of racial animosity." *Id.* at 478.

With those principles in mind, this Court has reviewed the transcripts and finds that the trial court appropriately applied *Batson* to each of the jurors at issue. At step one, the trial court heard arguments from defense counsel and held that Petitioner met his initial burden to show a *prima facie* case of discriminatory purpose. (D.E. 4-30, at 32:20 to 37: 22; 42:2–14.) Next, under step two, the court heard the prosecutor's race-neutral reasons for exercising his peremptory challenges. (*Id*. at 42:17 to 43:10; 43:18 to 45:7; 45:8 to 46:23; 46:24 to 47:18; 52:14–17). Contrary to Petitioner's allegations, (D.E. 1, at 24), the court also questioned the prosecutor to

clarify his answers and to explain how he arrived at certain conclusions. (D.E. 4-30, at 42:17 to 43:10; 43:18 to 45:7; 45:8 to 46:23; 46:24 to 47:18).

Finally, as to step three, the trial court considered all of the relevant circumstances, explained the court's reasoning as to each juror, and ultimately held that none of the prosecutor's reasons were suggestive of an improper purpose. (*Id*. at 52:17 to 55:15). The court then denied Petitioner's *Batson* challenges and denied Petitioner's motion to strike the jury or dismiss the indictment. (*Id*. at 55:13–15.) Petitioner essentially disagrees with the trial court's conclusion under step three. (D.E. 1, at 23–26.) Petitioner's allegation that the trial court "accepted all of [the prosecutor's] reasons without question," is not accurate. (D.E. 4-30, at 42:17 to 52:17.)

For those reasons, this Court agrees with the Appellate Division that the trial court had properly applied *Batson* in addressing the State's use of peremptory challenges. *Rollins*, 2014 WL 4064784, at *4–5. As a result, Petitioner has failed to demonstrate that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, or that its decision was based on an unreasonable determination of the facts. Consequently, Petitioner is not entitled to habeas relief on Ground One.

### b.  Partial Verdict Claim

Under Ground Five, Petitioner argues that the trial court erred by "taking a final partial verdict and then sending the jurors back to consider lesser included offenses that had been skipped in deliberations." (D.E. 1, at 26.)

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on direct appeal. The Appellate Division denied the claim as follows:

> On its second full day of deliberations, the jury asked the judge to define a "hung jury," and shortly thereafter asked how to "handle a juror that [wa]s unwilling to deliberate." With the consent of all

14

counsel, the judge provided the Model Charge regarding further deliberations.

On the fourth day of deliberations, the jury reported that it had reached a verdict on only some of the charges, and that further deliberation on the others would be futile. The parties agreed to take a partial verdict, and the judge began to do so, beginning with the verdicts as to Rollins. However, after reporting its inability to reach a verdict on count three, SBI aggravated assault of Mann, the jury indicated that it had failed to consider any of the lesser-included offenses on that count and had simply proceeded to count four. Rollins' counsel suggested that the jury be sent back to deliberate on the lesser-included charges, but the judge instead followed the prosecutor's suggestion to finish taking the verdicts on the remaining counts. As to Pierrevil, the jury also indicated an inability to reach a verdict on count three and its failure to consider the lesser included charges. The partial verdicts were taken in open court, and the jury was subsequently polled.

Neither defendant specifically objected to the judge's ensuing decision to have the jury continue to deliberate on the lesser-included offenses under count three. Within twenty minutes, the jury reported that it was unable to reach a unanimous verdict on any of the lesser-included offenses.

Defendants argue that the judge abused his discretion in accepting the partial verdict and permitting the jurors to continue deliberating rather than waiting until all deliberations had been completed. They contend that accepting the partial verdicts as final interrupted the jury's deliberative process, since resolution of the lesser-included offenses involved continued evaluation of the same evidence that supported some of the guilty verdicts.

The court rules expressly permit entry of a partial verdict at the conclusion of deliberations. *R.* 3:19–1(a). The Court has recognized that, where appropriate and within the trial court's sound discretion, an "interim partial verdict[,]" i.e., one taken *during* deliberations, is permissible. *State v. Shomo,* 129 *N.J.* 248, 254, 257–58 (1992). The procedure is to be used with caution, since according finality to an interim partial verdict could distort the deliberative process by prematurely freezing deliberations on a charge before full consideration of the issues and relevant evidence. *Id.* at 256–57.

To ensure that the jury understands and intends that its interim verdict be final, the court is required to unambiguously instruct the jury prior to taking the verdict "that its partial verdict will be treated

in all respects as a final verdict, not subject to reconsideration, even though the jury will continue deliberations on other counts." *Id.* at 258. The Court elaborated that, "[a]bsent such an instruction, the risk is too great that a jury might not comprehend a partial verdict's final effect, potentially denying a defendant the right to a unanimous jury verdict." *Id.* at 258. After providing such an instruction, the verdict must be "received in open court, recorded, and, if requested, confirmed by a polling of the jurors[.]" *Id.* at 259.

In this case, once the jury reported an inability to reach a verdict on count three as to both defendants, it was error for the judge to order continued deliberations as to the lesser-included offenses. *See State v. Johnson,* —— *N.J.Super.* ——, —— (App.Div.2014) (slip op. at 16 n. 14); *see also State v. Cooper,* 151 *N.J.* 326, 366 (1997) (noting that, because of the likelihood of compromise, juries should not be permitted to consider lesser-included offenses until they acquit a defendant of the greater offense). However, there was no objection to the judge's decision to order continued deliberations, and any error was clearly harmless. Although the judge did not provide any instruction regarding the finality of the partial verdict in this case, the jury had no expectation of continued deliberations; it believed its task was complete, as did the judge, the prosecutor and both defense lawyers. In any event, we fail to see how the jury's resumption of deliberations for twenty minutes before reporting an inability to return a unanimous verdict on the lesser-included charges prejudiced defendants in any way.

*Rollins*, 2014 WL 4064784, at *8–9 (alterations in original) (footnote omitted).  Here, the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, and Petitioner has not raised a valid federal claim.

In his Petition, Petitioner argues that the trial court failed to follow *state* law on partial verdicts, when it ordered the jury to continue deliberation on the lesser included offenses.  (D.E. 1, at 30–31.)  Petitioner fails to cite to any Supreme Court precedent on this issue, and this Court is not aware of any such case. *See, e.g.*, *Roberts v. Virga*, No. 12-1050, 2014 WL 657572, at *16 (C.D. Cal. Feb. 19, 2014); *Oleman v. Lempke*, No. 08-5003, 2010 WL 3175078, at *5 (E.D.N.Y. Aug. 10, 2010); *MacCarlie v. Lewis*, No. 00-1830, 2010 WL 2089515, at *22–23 (E.D. Cal. May 21, 2010), *subsequently aff'd sub nom. MacCarlie v. Spearman*, 543 F. App'x 634 (9th Cir. 2013);

*Diaz v. Crosby*, No. 04-20724, 2006 WL 8451602, at *7 (S.D. Fla. May 30, 2006).  As a result, despite the Appellate Division holding that the trial court had violated state law on taking partial verdicts, such an error was only an error of state law, and federal habeas "relief does not lie for errors of state law." *Estelle*, 502 U.S. at 67;  *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997).

Nor would this case fall within the ambit of *Lowenfield v. Phelps*, 484 U.S. 231, 237–41 (1988), where the Supreme Court held that coercive jury instructions are unconstitutional, and that courts must judge coerciveness based on the totality of the circumstances. *Lowenfield*, 484 U.S. at 237–241.  *Lowenfield* would not apply because, as the Appellate Division noted, the jury returned after twenty minutes and reported that they were unable to reach a verdict on the lesser included charges. *Rollins*, 2014 WL 4064784, at *9.  Consequently, it does not appear that the jury suffered any substantial coercion and, more critically, Petitioner was not prejudiced in any way.

For those reasons, Petitioner has failed to demonstrate that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, and he is not entitled to habeas relief on Ground Five.

### B.  Evidence Related Claims

#### a.  The Admission of Officer Marranca's Identification

Under Ground Two, Petitioner contends that the trial court erred by admitting Officer Marranca's out-of-court identification of Petitioner into evidence. (D.E. 1, at 26.)  According to Petitioner, Officer Marranca was only able to briefly see the driver of the Lexus during the one or two seconds "that the Lexus sped past him." (*Id*. at 27.)   Petitioner's co-defendant identified Petitioner by name, and the following day, Officer Marranca "pulled petitioner's picture up on the

computer and decided that petitioner was the driver of the Lexus." (*Id*.)  Petitioner argues that this identification was impermissibly suggestive and violated his rights to due process.

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on direct appeal.  The Appellate Division denied the claim as follows:

> Marranca testified at a pre-trial *Wade* hearing that, after pursuing the two vehicles into the parking lot in Jersey City and exiting his car, he was able to clearly observe the driver of the Lexus, both through the windshield and then through the rolled-down front passenger window, as the car sped past him. When he later discovered that the Lexus had crashed, Marranca inquired as to the identifying information, including the name and date of birth of the individual who was arrested following the accident. Marranca testified that he needed the information to complete his file. In the course of doing so, Marranca, who had never seen Rollins before, saw a photograph of Rollins in a criminal history report and immediately recognized him as the driver of the Lexus.
>
> The judge found Marranca to be credible and determined that the out-of-court identification procedure, by the "very nature of viewing one photo[, wa]s obviously suggestive." Noting the circumstances under which Marranca first saw Rollins' photo, the judge concluded the procedure was "more akin to a show-up rather than a traditional photo array . . . shown to a witness to see if they can identify . . . the perpetrator . . . ." *See State v. Herrera,* 187 *N.J.* 493, 504 (2006) (recognizing that "one-on-one show[-]ups are inherently suggestive [,]" because "the victim can only choose from one person, and, generally, that person is in police custody"). The judge considered all of the circumstances regarding Marranca's ability to view Rollins as he sped by, and concluded that the out-of-court identification and subsequent in-court identification of Rollins by Marranca were reliable despite the suggestive nature of the out-of-court identification procedure.
>
> Rollins contends that the judge should have suppressed Marranca's identification of him because the identification procedure was impermissibly suggestive and created a substantial likelihood of misidentification. We disagree, but, even if the judge erred in admitting Marranca's testimony regarding his identification of Rollins as the driver of the Lexus, the error was harmless beyond a reasonable doubt. *See State v. Lazo,* 209 *N.J.* 9, 26 (2012) ("The harmless error standard requires that there be some degree of possibility that the error led to an unjust result. The possibility must

be real, one sufficient to raise a reasonable doubt as to whether it led the jury to a verdict it otherwise might not have reached." (quotation omitted)).

Undoubtedly, the Court's opinion in *State v. Henderson,* 208 *N.J.* 208 (2011), altered the landscape regarding the admissibility of identification evidence in New Jersey. However, *Henderson* was decided after the trial in this case, and the Court limited its holding to "future cases only." *Id.* at 302. As a result, we assess the judge's decision in this case under the then-existing controlling precedent, specifically, *State v. Madison,* 109 *N.J.* 223 (1988). *See State v. Micelli,* 215 *N.J.* 284, 287 (2013) ("The *Madison* standard applies . . . because the out-of-court identifications were completed prior to [the Court's] . . . decision in [*Henderson* ]").

The *Madison* Court adopted "essentially verbatim" the United States Supreme Court standard articulated in in *Manson v. Brathwaite,* 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L. Ed.*2d 140, 154 (1977). *Micelli, supra,* 215 *N.J.* at 290. "Pursuant to the *Manson/Madison* test, the process of determining whether an out-of-court identification is admissible at trial consists of two steps." *Id.* at 291.

First, the judge must determine whether the out-of-court procedure was "impermissibly suggestive." *Ibid.* (citation omitted). Then,

> [i]f there is a finding of impermissible suggestiveness, the court must determine whether the objectionable procedure resulted in a very substantial likelihood of irreparable misidentification. To make that assessment, the judge must analyze the reliability of the identification by considering the totality of the circumstances and weighing the suggestive nature of the procedure against the reliability of the identification. The evidence may be admitted at trial if the judge finds that the identification procedure was nevertheless reliable despite the impermissibly suggestive procedure used.

[*Ibid.* (citations omitted) ]

The Court has recognized certain factors to consider in determining reliability.

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.
>
> [*Herrera, supra,* 187 *N.J.* at 503 (quoting *Manson, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L. Ed.*2d at 154).]
>
> Here, the judge carefully considered Marranca's testimony. Marranca testified that his view of the driver of the Lexus was brief but clear. He recalled that the passenger in the car had pulled his shirt up over his face to avoid detection, but the driver had not. As he aimed his weapon, Marranca's only focus at that moment was the driver of the vehicle. Lastly, Marranca exhibited a high level of certainty when he first saw Rollins' photo, less than twenty-four hours after the incident. We find no basis to disturb the trial judge's findings and conclusions regarding the out-of-court identification and subsequent in-court identification.
>
> Even if we were wrong in our assessment, the admission of Marranca's identification testimony was harmless beyond a reasonable doubt. Turkowsky observed Rollins exit the driver's side of the car just prior to his arrest, and the officer identified Rollins in court before the jury.

*Rollins*, 2014 WL 4064784, at *5–7 (alterations in original) (footnote omitted).  Here, the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.

As mentioned by the Appellate Division, the applicable United States Supreme Court case on this issue is *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).  Under the *Manson* test, "a court must first assess whether the eyewitness identification procedure at issue was, under the 'totality of the circumstances,' unnecessarily suggestive."  *Locus v. Johnson*, No. 18-11527, 2021 WL 1749466, at *7–8 (D.N.J. May 4, 2021) (quoting *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 335 (3d Cir. 2016) (McKee, C.J., concurring)).  If a court finds that the

circumstances were unnecessarily suggestive, "a court must consider five factors to determine whether the resulting identification is nonetheless reliable." *Id*.  Those factors are:

> (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. These factors are weighed against the corrupting effect of the suggestive identification itself.

*Id*. (internal quotation marks omitted).

With those principles in mind, the Appellate Division agreed with the trial judge that the circumstances of the out-of-court identification, by the "very nature of viewing one photo," were "obviously suggestive." *Rollins*, 2014 WL 4064784, at *5–6.  The court also noted that the procedure was "more akin to a show-up rather than a traditional photo array . . . shown to a witness to see if they can identify . . . the perpetrator." *Id*. (internal quotation marks omitted). Consequently, the court had to engage in the second part of the *Manson* test, to determine whether the identification was nevertheless reliable.

As to the first factor, the Appellate Division considered that the trial judge found, that Officer Marranca had a "brief but clear" view of Petitioner. *Id.* at *7.  Under the second factor, the witness' degree of attention, the trial judge noted that the officer "recalled that the passenger in the car had pulled his shirt up over his face to avoid detection, but the driver[, Petitioner], had not," and that as "he aimed his weapon, Marranca's only focus at the moment was the driver of the vehicle." *Id*.  The third factor, the accuracy of the witness' prior description, does not apply in this case, as it does not appear that Officer Marranca offered a prior description. *Id*.  at *5–7.  Next, under the fourth factor, the witness' level of certainty at the "confrontation," the court found credible that upon seeing the photo, Officer Marranca "immediately recognized [Petitioner] as the

driver of the Lexus," and concluded that he "exhibited a high level of certainty." *Id*. at *7. As to the last factor, the length of time between the crime and the "confrontation" was less than twenty-four hours. *Id*. Taken together, the trial judge found, and the Appellate Division agreed, that based on the totality of the circumstances, Officer Marranca's identification was "reliable despite the suggestive nature of the out-of-court identification procedure." *Id*. at *5, *7.

Ultimately, Petitioner takes issue with Officer Marranca's credibility, but this Court must presume that the state court's factual determinations were correct unless Petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El*, 545 U.S. at 240. Petitioner's Petition offers only his disagreement that Officer Marranca was able to identify him, and such speculation falls far short of rebutting the presumption of correctness by clear and convincing evidence. (D.E. 1, at 26–28.) As a result, this Court finds no error in the Appellate Division's decision that the identification was sufficiently reliable and therefore admissible. In turn, that decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief on Ground Two.

### b. Sufficiency of the Evidence as to Conspiracy to Commit Carjacking

As to Ground Six, Petitioner contends that the State failed to present evidence to prove that he conspired to commit carjacking. (D.E. 1, at 32.) Petitioner appears to contend that there was only evidence that he had conspired to kidnap Mr. Mann, and that one of his co-perpetrators, Mr. Pierrevil, had independently decided to carjack Mr. Mann. (*Id*. at 32–33.) Consequently, Petitioner implies that the trial court should have granted his motion for a judgment of acquittal, at least as to the conspiracy to commit carjacking count.

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on direct appeal. The Appellate Division denied the claim as follows:

After the State rested, both defendants moved for a judgment of acquittal on all counts of the indictment. The judge denied the motions, concluding without reference to any particular charge that the State had presented sufficient evidence to permit a reasonable jury to find guilt beyond a reasonable doubt. *See State v. Reyes,* 50 *N.J.* 454, 459 (1967). Both defendants now contend that they were entitled to a judgment of acquittal on the charge of conspiracy to commit carjacking because the State presented no evidence, independent of their participation in the substantive offense itself, that there ever was an agreement to carjack Mann's vehicle. The argument lacks sufficient merit to warrant extensive discussion in a written opinion. *R.* 2:11–3(e)(2). We add only the following.

"[T]he agreement to commit a specific crime is at the heart of a conspiracy charge." *State v. Samuels,* 189 *N.J.* 236, 245 (2007). "The mere knowledge, acquiescence, or approval of the substantive offense, without an agreement to cooperate, is not enough to establish one as a participant in a conspiracy." *State v. Abrams,* 256 *N.J.Super.* 390, 401 (App.Div.1992) (citation omitted). However, "[c]ourts have regularly held that a conspiracy may be proven through circumstantial evidence." *State v. Cagno,* 211 *N.J.* 488, 512 (2012) (citing *Samuels, supra,* 189 *N.J.* at 246). Here, the jury could easily infer that defendants agreed to carjack Mann's BMW, and that they acted in a concerted and deliberate manner to do so.

Rollins additionally claims that even if the evidence supported the finding of a conspiratorial agreement, there was only evidence of a conspiracy to kidnap Mann, rather than evidence of a conspiracy to carjack his BMW, and that the theft of his car was purely spontaneous, not the object of any prior agreement. While there may have been adequate evidence to support the charge of conspiracy to commit kidnapping, the only relevant inquiry is whether there was sufficient evidence to support the conspiracy to commit carjacking charge. There clearly was.

*Rollins*, 2014 WL 4064784, at *7.  Here, the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.

The clearly established federal law on this point is *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In *Jackson*, the Supreme Court held that when considering a sufficiency of the evidence claim, "the relevant question is whether, after reviewing the evidence in the light most favorable

to the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Sullivan v. Cuyler*, 723 F.2d 1077, 1083–84 (3d Cir. 1983) (citing

*Jackson*, 443 U.S. at 319)).   The same standard applies to post-verdict motions for judgment of

acquittal. *See United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).

In New Jersey, carjacking is defined as follows:

> a. Carjacking defined. A person is guilty of carjacking if in the
> course of committing an unlawful taking of a motor vehicle, as
> defined in R.S.39:1-1, or in an attempt to commit an unlawful taking
> of a motor vehicle he:
>
> (1) inflicts bodily injury or uses force upon an occupant or person
>     in possession or control of a motor vehicle;
>
> (2) threatens an occupant or person in control with, or purposely or
>     knowingly puts an occupant or person in control of the motor
>     vehicle in fear of, immediate bodily injury;
>
> (3) commits or threatens immediately to commit any crime of the
>     first or second degree; or
>
> (4) operates or causes said vehicle to be operated with the person
>     who was in possession or control or was an occupant of the
>     motor vehicle at the time of the taking remaining in the vehicle.
>
> An act shall be deemed to be "in the course of committing an
> unlawful taking of a motor vehicle" if it occurs during an attempt to
> commit the unlawful taking of a motor vehicle or during an
> immediate flight after the attempt or commission.

N.J. Stat. § 2C:15-2.

The jury heard evidence that showed that Petitioner *and his co-perpetrators*, worked

together to threaten, force, and inflict bodily injury on Mr. Mann, and ultimately steal his car.

*Rollins*, 2014 WL 4064784, at *2–3.   In his Petition, Petitioner emphasizes that there was no direct

testimony "to suggest an agreement to carjack Mr. Mann." (D.E. 1, at 33.)   As the Appellate

Division explained, however, direct evidence was not necessary, and that based on circumstantial

evidence, the "jury could [have] easily infer[ed] that defendants agreed to carjack Mann's BMW, and that they acted in a concerted and deliberate manner to do so." *Rollins*, 2014 WL 4064784, at *7.

Petitioner seems to imply that he had only conspired to kidnap[1] Mr. Mann, (D.E. 1, at 33), but, as the Appellate Division reasoned, it was irrelevant that "there may have been adequate evidence to support the charge of conspiracy to commit kidnapping, the only relevant inquiry [was] whether there was sufficient evidence to support the conspiracy to commit carjacking charge. There clearly was." *Id*.  As a result, although the Appellate Division addressed the issue in terms of state law, its decision was not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief under Ground Six.

### C.  Excessive Sentence Claims

Petitioner next contends that his aggregate sentence of forty years with a thirty year and six-month period of parole ineligibility violated his rights. (D.E. 1, at 22.)  In particular, under Grounds Three, Four, and Nine,[2] Petitioner argues that (1) the trial court improperly applied the sentencing factors in his case, and (2) that he should not have received consecutive sentences. (D.E. 1, at 28–29, 37.)

The last reasoned state court decision with respect to this claim is the Appellate Division's decision on direct appeal:

> In imposing sentence on defendants, the judge recounted . . . [Rollins'] extensive criminal history, including five juvenile petitions, three of which resulted in adjudications for offenses including receiving stolen property, joyriding, and robbery. Rollins

---

[1] The jury could not reach a verdict on the kidnapping count. (D.E. 4-15, at 9.)

[2] Under Ground Nine, Petitioner challenges the trial court's application of the sentencing factors and imposition of consecutive sentences at resentencing in particular, rather than his original sentence. (D.E. 1, at 37.)

had been arrested sixteen times as an adult, and been convicted and served prison terms for drug and weapons offenses. The judge found that both defendants qualified as persistent offenders, eligible for an extended-term pursuant to *N.J.S.A.* 2C:44–3.

The judge grouped the numerous offenses into three categories. The first consisted of conspiracy to commit carjacking, conspiracy to commit aggravated assault by shooting at Mann, and two counts for possession of a weapon for those unlawful purposes. The second set of crimes included eluding, resisting arrest, and receiving stolen property. The judge viewed the two counts for unlawful possession of a weapon as a separate third category of offenses. He concluded that each set of offenses had a distinct and independent objective— the first, to target a particular individual with violence; the second, to escape being caught "at all cost"; and the third, to possess weapons without a permit. As such, the judge decided that sentences within each category would run concurrently with each other, but consecutively with sentences in the other categories. Otherwise, "each of the separate criminal acts that followed the initial conspiracy to commit the carjacking and aggravated assault would be essentially free crimes for which [each] defendant would face no consequences whatsoever."

The judge carefully explained his finding of aggravating sentencing factors three, six and nine as to both defendants. *N.J .S.A.* 2C:44–1(a)(3) (the risk of re-offense); (6) (criminal history); and (9) (the need to deter). He found no mitigating factors as to either defendant. *N.J.S.A.* 2C:44–1(b).

For the first category of offenses, the court imposed on each defendant a maximum extended-term sentence of imprisonment for twenty years on count two (conspiracy to commit carjacking), subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2. The judge merged the other convictions in this category of offenses and imposed a concurrent term.

Turning to the second category of offenses, the judge imposed ten-year sentences with five-year parole disqualifiers on the counts for unlawful possession of weapons. The judge sentenced both defendants to ten-year terms with five-year parole disqualifiers on the eluding counts, consecutive to the sentences already imposed, and to concurrent five-year terms on each of the counts for resisting arrest and receiving stolen property. The judge also imposed an additional concurrent ten-year sentence on Rollins for the SBI assault conviction, subject to NERA.

The result was aggregate sentences of forty years for each defendant, with . . . a thirty-and-one-half year ineligibility period for Rollins.

Before us, both defendants challenge their sentences as excessive. Defendants argue that the judge relied solely on their past criminal records to justify both an extended term and the finding of certain aggravating factors to impose the maximum extended term sentence. Defendants also argue that consecutive sentences were unjustified.

"Appellate review of the length of a sentence is limited." *State v. Miller,* 205 *N.J.* 109, 127 (2011). We assess whether the aggravating and mitigating factors were based upon "competent credible evidence in the record." *Ibid.* (quotation omitted). We do not " 'substitute [our] assessment of aggravating and mitigating factors' for the trial court's judgment." *Ibid.* (quoting *State v. O'Donnell,* 117 *N.J.* 210, 215 (1989)). When the judge has followed the sentencing guidelines, and his findings of aggravating and mitigating factors are supported by the record, we will only reverse if the sentence "shocks the judicial conscience" in light of the particular facts of the case. *State v. Roth,* 95 *N.J.* 334, 364 (1984) (citation omitted); *accord State v. Cassady,* 198 *N.J.* 165, 183–84 (2009).

The judge's finding that aggravating factors three, six and nine applied to each defendant is unassailable. The judge carefully considered the appropriateness of an extended term sentence on the conspiracy to commit carjacking charge, and his decision to impose a maximum term on that count, and the other counts, reflects a careful weighing of the sentencing criteria. We find no basis to upset the length of the sentences imposed.

We also reject the contention that the judge abused his discretion by imposing consecutive sentences. In *Yarbough, supra,* 100 *N.J.* at 643–44, the Court set forth the factors to consider when deciding whether to impose consecutive or concurrent sentences. The *Yarbough* factors essentially focus upon " 'the nature and number of offenses for which the defendant is being sentenced, whether the offenses occurred at different times or places, and whether they involve numerous or separate victims.' " *State v. Carey,* 168 *N.J.* 413, 423 (2001) (quoting *State v. Baylass,* 114 *N.J.* 169, 180 (1989)).

27

> Here, the judge carefully grouped defendants' criminal activities into three categories, imposing concurrent sentences within each, but consecutive sentences from one category to the next. The rationale for imposing consecutive sentences reflects the underlying philosophy that when crimes are committed against different victims at different times, consecutive sentences are appropriate. *Id.* at 422–23. . . .
>
> For the reasons already stated, we vacate the sentence imposed upon Rollins for the conviction on count ten, and remand the matter to the trial court for the entry of an amended judgment of conviction, and for further proceedings consistent with this opinion.

*Rollins*, 2014 WL 4064784, at *12–14 (alterations in original).   The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.  Although Petitioner made passing references to the Eighth and Fourteenth Amendments under Grounds Four and Five, (D.E. 28–30), he raised only state law claims on direct appeal. (D.E. 4-15, at 30–35.)  In turn, the Appellate Division addressed the issue in terms of state law.

In any event, a federal court's ability to review state sentences is limited to challenges based on "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies." *See Grecco v. O'Lone*, 661 F. Supp. 408, 415 (D.N.J. 1987) (citation omitted).   Thus, federal courts may not review a challenge to a state court's discretion at sentencing unless it violates a separate federal constitutional limitation. *See Pringle v. Court of Common Pleas*, 744 F.2d 297, 300 (3d Cir. 1984); *see also* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67.

"Generally, a sentence within the [statutory] limits . . . is neither excessive nor cruel and unusual under the Eighth Amendment."  *United States v. Miknevich*, 638 F.3d 178, 186 (3d Cir. 2011).   The Eighth Amendment also, "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" *Ewing v. California*, 538 U.S. 11, 20 (2003) (citations omitted).   The

Supreme Court has identified three factors to determine whether a sentence is so disproportionate to the crime that it violates the Eighth Amendment: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Solem v. Helm*, 463 U.S. 277, 292 (1983).

The first factor acts as a gateway to the proportionality inquiry. The Eighth Amendment only forbids sentences that are "grossly disproportionate" for a conviction for the crime involved. *Butrim v. D'Ilio*, No. 14-4628, 2018 WL 1522706, at *16–17 (D.N.J. Mar. 28, 2018). If the petitioner fails to demonstrate a gross imbalance between the crime and the sentence, a court's analysis of an Eighth Amendment challenge ends. Successful proportionality challenges in non-capital cases are "exceedingly rare." *Ewing*, 538 U.S. at 21 (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)); *United States v. Burnett*, 773 F.3d 122, 136–37 (3d Cir. 2014). "Absent colorable allegations that his sentence constitutes cruel and unusual punishment . . . or that it is arbitrary or otherwise in violation of due process, the legality and length of his sentence are questions of state law" over which this Court has no jurisdiction. *E.g.*, *Rabaia v. New Jersey*, No. 15-4809, 2019 WL 699954, at *12–13 (D.N.J. Feb. 20, 2019) (citing *Chapman v. United States*, 500 U.S. 453, 465 (1991)).

The trial court grouped Petitioner's convictions into three categories, and imposed concurrent sentences within each category, but consecutive sentences from one category to the next. *Rollins*, 2014 WL 4064784, at *14. As to the first category of offenses, under Count Two, Petitioner received a twenty-year extended term for second degree conspiracy to commit carjacking, which was the maximum sentence but within the statutory limit. N.J. Stat. §§ 2C:5-2, 2C:15-2, 2C:43-7(a)(3); *Rollins*, 2014 WL 4064784, at *12. The trial court merged Petitioner's

conviction under Count Four, for second-degree conspiracy to commit aggravated assault, with Count Two. (D.E. 4-6, at 2.)  Next, for Counts Twelve and Sixteen, second degree possession of a weapon for unlawful purposes, Petitioner received two ten-year terms, which were again the maximum but within the statutory limit. N.J. Stat. §§ 2C:5-2, 2C:12-1(b)(1), 2C:43-7(a)(3); *Rollins*, 2014 WL 4064784, at \*12.  Under the second category of offenses, Petitioner received (1) a ten-year sentence for second degree eluding under Count Nine, (2) two five-year terms for third-degree receiving stolen property under Counts Seventeen and Eighteen; and (3) a five-year term for third-degree resisting arrest under Count Nineteen.  (D.E. 4-6, at 2–4.)  As to the final category of offenses, Petitioner received two ten-year sentences for second-degree unlawful possession of a weapon under Counts Eleven and Fifteen. (*Id*.)  Each of these sentences was the maximum sentence for their respective offenses, but within the statutory limits. N.J. Stat. §§ 2C:29–2(b), 2C:20–7, 2C:29–2(a)(3)(b), 2C:39-5(b), 2C:43-6(a).  In sum, each of Petitioner's sentences were within the statutory limits, and "[g]enerally, a sentence within the [statutory] limits . . . is neither excessive nor cruel and unusual under the Eighth Amendment."  *Miknevich*, 638 F.3d at 186.

Nor do Petitioner's individual sentences rise to the level of disproportionality that would violate the Eighth Amendment.  Given the state court's thorough explanation for Petitioner's sentence, which included his extensive criminal history, *Rollins*, 2014 WL 4064784, at \*12–13, "it is clear that this is not one of those rare or extreme cases where, based on Supreme Court precedent, a defendant's sentence would be considered grossly disproportionate to the crime[s] of which he was convicted." *Clay v. Fisher*, No. 14-736, 2016 WL 3568581, at \*7 (W.D. Pa. July 1, 2016); *see Hester v. Pierce*, No. 13-812, 2016 WL 5539588, at \*8 (D. Del. Sept. 28, 2016).

Finally, Petitioner's claims that the trial court failed to properly apply the sentencing factors in his case, or that it had improperly sentenced him consecutively, are questions of state

law over which this Court has no jurisdiction. *E.g.*, *Figueroa v. Buechele*, No. 15-2972, 2016 WL 3457013, at *5 (D.N.J. June 23, 2016); *Friedman v. Buechele*, No. 14-2638, 2016 WL 2981536, at *4 (D.N.J. May 23, 2016); *see also Ulysse v. Johnson*, No. 16-7845, 2020 WL 7137860, at *7 (D.N.J. Dec. 7, 2020).  It "is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *McGuire*, 502 U.S. at 67–68.

Thus, although the Appellate Division addressed Petitioner's sentencing claims under the lens of state law, its reasoning was neither contrary to, nor an unreasonable application of, clearly established federal law.  For the foregoing reasons, Petitioner is not entitled to habeas relief on Grounds Three, Four, and Nine.

### D.  Ineffective Assistance of Counsel Claims

Petitioner next raises multiple claims of ineffective assistance of counsel.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Cont. amend. VI.  The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  To prevail on a claim of ineffective assistance of counsel, a petitioner must establish that (1) counsel's performance was deficient, and (2) that the deficient performance prejudiced the petitioner.  *Id.* at 687.

The first *Strickland* prong is an objective standard which requires the petitioner to show that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id*. at 687.  In evaluating whether counsel was deficient, "the proper standard for attorney performance is that of reasonably effective assistance." *Id*.  The standard is deferential, and courts presume that counsel has "rendered adequate assistance" and to have used

"reasonable professional judgment." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016).  The second prong of the *Strickland* test requires that a petitioner demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  The petitioner bears the burden of demonstrating how he was prejudiced.  Thus, where a petition contains "no factual matter . . . and only provides unadorned legal conclusion[s] . . . without supporting factual allegations, that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief." *Judge v. United States*, 119 F. Supp. 3d 270, 280–81 (D.N.J. 2015) (internal quotation marks omitted) (citations omitted).

A court need not address both components of the ineffective assistance inquiry. *Strickland*, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice" courts should follow that course. *Id.*  Finally, even if a petitioner can establish both prongs of *Strickland*, a habeas petition fails unless the petitioner can demonstrate that the state court applied *Strickland* in an "objectively unreasonable manner." *See Woodford v. Viscotti*, 537 U.S. 19, 24–25 (2002); *see also* 28 U.S.C. § 2254(d)(1).

### 1.  Vague Ineffective Assistance of Counsel Claims

The Court first addresses Grounds Seven (A), (C), and (E).  Under Ground Seven (A), Petitioner contends that counsel "was ineffective for failing to conduct any meaningful adversarial challenges to the State's evidence." (D.E. 1, at 34.)  Next, under Ground Seven (C), Petitioner alleges that counsel had failed to "investigate Mr. Mann['s] prior cooperation with law enforcement." (*Id.*)  Finally, as to Ground Seven (E), Petitioner argues that counsel "failed to

communicate a favorable plea agreement to him." (*Id*. at 35.)  Petitioner offers no further

elaboration on these points in his Petition or in either of his PCR briefs.[3]

As a preliminary matter, the Court finds that these claims fail to comply with Habeas Rule

2(c).  Pursuant to that Rule, a § 2254 petition must "specify all the grounds for relief available to

the petitioner [and] state the facts supporting each ground."  Petitions which provide no more than

"vague and conclusory grounds for habeas relief are subject to summary dismissal" under the

rule.  *Anderson v. Pennsylvania Attorney General*, 82 F. App'x 745, 749 (3d Cir. 2003); *see

also United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000); *United States v. Dawson*, 857

F.2d 923, 928 (3d Cir. 1988).

Here, under Ground Seven (A), the Petition and PCR briefs fail to explain with any

specificity how he believes counsel failed "to conduct any meaningful adversarial challenges to

the State's evidence." (D.E. 1, at 34–35; D.E. 4-9, at 4.)  For example, he fails to identify the

evidence at issue, or how counsel should have challenged that evidence.[4] (D.E. 1, at 34–35; D.E.

4-9, at 4.)  Similarly, as to Ground Seven (C), Petitioner fails to explain how he believes counsel

failed to communicate a favorable plea offer. (D.E. 1, at 34–35; D.E. 4-9, at 4–5.)  For instance,

he fails to identify the terms of the alleged plea offer or when the State offered the plea.[5] (D.E. 1,

---

[3] In Petitioner's *pro se* PCR brief, he appears to raise Ground Seven (E) as a complete failure to
advise him of a plea offer but offers no further elaboration. (D.E. 4-9, at 4.)  In his counseled PCR
brief, counsel appears to address this issue as a failure to adequately advise Petitioner of a favorable
plea offer, focusing on whether Petitioner received advice regarding an extended term. (D.E. 4-10,
at 7.)  The Court will address the extended term issue in a separate section.

[4] Petitioner does challenge some evidence specifically, but he raises those issues as separate
grounds, such as his Ground 7 (B), where he alleges that counsel failed to cross-examine Mr. Mann
regarding his alleged prior cooperation with law enforcement.

[5] Additionally, the PCR Court denied the claim in part because there was no dispute that Petitioner
was aware of the twelve-year plea offer. (D.E. 4-11, at 13 n.11.)  Indeed, Petitioner's Petition is
replete with allegations that he was aware of the twelve-year plea offer. (*See, e.g.*, D.E. 1, at 36,

at 34–35; D.E. 4-9, at 4–5.)  Finally, as to Ground Seven (E), Petitioner fails to explain how or when Mr. Mann allegedly cooperated with law enforcement. (D.E. 1, at 35; D.E. 4-10, at 9.) Consequently, the Court will summarily deny Grounds Seven (A), (C), and (E) as vague and conclusory under Habeas Rule 2.

The Court also finds that the Appellate Division reasonably applied *Strickland* when it summarily denied these claims for substantially the same reasons set forth by the PCR court. *Pierrevil*, 2018 WL 1004063, at *3.  In denying these claims, the PCR court held that Petitioner's bare assertions were insufficient to establish a *prima facie* case of ineffective assistance of counsel. (D.E. 4-11, at 13 n.11, 18–19.)  Accordingly, Petitioner has failed to show that the state court unreasonably applied either prong of *Strickland* as to any of these claims, and he is not entitled to habeas relief on Grounds Seven (A), (C), and (E).

### 2. Ineffective Assistance of Counsel in Failing to Cross-Examine Mr. Mann

Next, under Ground Seven (B), Petitioner contends that trial counsel was ineffective for failing to cross-examine Mr. Mann (D.E. 1, at 37–38.)  He offers no further elaboration in his Petition or his PCR briefs. (D.E. 1, at 34–35; D.E. 4-10, at 9.)  In his counseled PCR brief, Petitioner vaguely alleged that trial counsel could have used Mr. Mann's prior cooperation with law enforcement to show bias during cross-examination. (D.E. 4-10, at 9.)  As discussed in the previous Section, however, the state court reasonably rejected that bare assertion as insufficient to establish a *prima facie* case of ineffective assistance of counsel.  In this Section, this Court will address more broadly, the issue of whether counsel was ineffective for declining to cross-examine Mr. Mann.

---

38.)

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on PCR appeal, which affirmed for substantially the same reasons as set forth in the PCR court's opinion, and added:

> A.M. had previously identified both defendants from a photo array; however, in the grand jury and at trial, A.M. did not identify either defendant and claimed both wore ski masks during the incident. Rollins, slip op. at 7. Rollins' trial counsel also posed no questions to A.M.
>
> [. . . .]
>
> The judge characterized trial counsel's decision not to cross-examine A.M. as a strategic one, to which the court owed "'extreme deference.'" *Fritz*, 105 N.J. at 52. As already noted, because A.M. could not identify either defendant at trial, it made no sense to cross-examine him about his prior out-of-court identification. As the judge noted, defense counsel wisely avoided the risk of "eliciting a positive . . . identification."

*Pierrevil*, 2018 WL 1004063, at *1 n.3, *3.  The PCR court had opined that

> Petitioner argues that trial counsel did not conduct an adequate cross-examination of Ahmed Mann at trial because he did not confront Mr. Mann with inconsistences between his statements to the police and to the grand and petit juries.
>
> The Sixth Amendment to the U.S. Constitution and Article I, paragraphs 1 and 10, of the New Jersey Constitution both afford a defendant in a criminal case the right to confront the witnesses against him. This right includes the right to cross-examine such witnesses. *State v. Williams*, 182 N.J. Super. 427, 434 (App. Div: 1982).
>
> At trial, under direct examination by the prosecutor, Mr. Mann did not identify Petitioner and Pierrevil as the assailants. 19T 144-165. He did not provide any detailed information about his assailants and said only that the men wore ski masks. 19T 151-21 to 22.
>
> The Court must give "extreme deference" to trial counsel's decision not to cross-examine Mr. Mann. *Arthur*, 184 N.J. at 322. Here, defense counsel's declination to cross-examine reflected his client's best interests and avoided the introduction of unwanted evidence.

> Had trial counsel decided to cross-examine Mr. Mann, he risked eliciting a positive eyewitness identification of Petitioner and potentially inculpating his client. Trial counsel also demonstrated that the decision not to cross-examine Mr. Mann in particular was a strategic maneuver because he decided to vigorously cross-examine other witnesses, including Cynthia Mann, Sgt. Mananca, and Officer Turkowsky. 21T 119-7 to 127-14, 96-14 to 114-3, 157-5 to 182-15.
>
> Trial counsel's decision not to cross-examine Mr. Mann was not deficient and therefore fails the first prong of *Strickland*.

(D.E. 4-11, at 18.)  Here, the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.

As to the first prong, deficient performance, the Appellate Division considered the circumstances involving Mr. Mann's testimony.  The court emphasized that Mr. Mann had not identified Petitioner during direct examination as he claimed that both men wore ski masks during the incident. *Pierrevil*, 2018 WL 1004063, at *1 n.3, *3.  This Court agrees that under these circumstances, "it made no sense to cross-examine [Mr. Mann] about his prior out-of-court identification." *Id*. at *3.  Had counsel cross-examined Mr. Mann about identifying Petitioner by photo array—which the jury did not hear—he risked eliciting a positive identification of Petitioner and inculpating his client. (D.E. 4-11, at 18.)  Additionally, as the state courts noted, trial counsel's decision was plainly a strategic one, as he vigorously cross-examined other witnesses. (*Id*.)

For those reasons, the Appellate Division reasonably concluded that Petitioner had failed to show that counsel's performance was deficient.  The court concluded its analysis at the first prong, and it was not necessary for the court to assess *Strickland* prejudice. *Strickland*, 466 U.S. at 697.  As a result, Petitioner has failed to demonstrate that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, and Petitioner is not entitled to habeas relief on Ground Seven (B).

### 3. Ineffective Assistance of Counsel for Failing to Move to Strike Juror #6

Under Ground Seven (D), Petitioner contends that counsel was ineffective for failing to move to strike Juror #6.[6] (D.E. 1, at 34.)  Petitioner contends, at an unspecified time, that Juror #6 "thought [Petitioner] looked familiar, and possibly might have known the same people," and that she "was a victim of a crime and was possibly associated with people with criminal records." (*Id.* at 35.)  Petitioner alleges that the juror did not disclose this information during *voir dire.*

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on PCR appeal, which affirmed for substantially the same reasons as set forth in the PCR court's opinion. *Pierrevil*, 2018 WL 1004063, at *3.  The PCR court had ruled as follows:

> Petitioner argues that trial counsel was ineffective for failing to excuse Juror #6 for cause.  At an unknown time, Petitioner allegedly informed trial counsel that Juror #6 was a victim of a crime and that she possibly associated with people who had criminal records. According to Petitioner, Juror #6 never disclosed this information during *voir dire.* Trial counsel neither moved to strike this juror nor requested that the trial court conduct a hearing on this issue.
>
> The right to due process encompasses a criminal defendant's right to a fair trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *State v. Feaster*, 156 N.J. 1, 50 (1998). "An impartial jury is, of course, a necessary condition to a fair trial, and a *voir dire* designed to expose potential bias is essential to ensure an impartial jury." *State v. Hunt*, 115 N.J. 330, 348 (1989) (citing *State v. Williams*, 113 N.J. 393 (1988)).
>
> Petitioner's claim of prejudice on this ground is wholly contradicted by the May 17, 2011 jury selection transcript. In contrast to Petitioner's allegations, Juror #6 did reveal during *voir dire* that she was the victim of crimes in that her car was stolen a few times and that she filed complaints with the police. 6T17 100-19 to 101-2. She

---

[6] Petitioner lists Juror #6 and Juror #351 in his Petition, but they appear to be the same juror. (D.E. 4-11, at 19 ("Although Petitioner lists in his table of contents that trial counsel was ineffective for failing to excuse both Juror #6 and Juror #351 for cause, he argues only that trial counsel was ineffective for failure to strike Juror #6. The State asserts that Juror #6 and Juror #351 are the same juror.").)

said, however, that there was nothing   about those incidents that could affect her ability to be fair in Petitioner's case. *Id.* at 101-7 to 10.

Additionally, Petitioner offers no support whatsoever to prove that Juror #6 "possibly associated with people with criminal records" and does not explain why trial counsel should have moved to strike this juror on this ground.  To sustain his burden for post-conviction relief, Petitioner must be "prepared to 'establish by a preponderance of the credible evidence, that he is entitled to the requested relief'" and must allege "specific facts . . . which would provide the court with an adequate basis on which to rest its decision." *Mitchell*, 126 N.J. at 579. Here, there is a complete dearth of specific facts showing that Juror #6 associated with people who had criminal records.

Considering that Juror #6 had in fact been the victim of crimes and even assuming *arguendo* that Juror #6 associated with people with criminal records, Petitioner does [not] provide any explanation as to why trial counsel's failure to strike Juror #6 would have produced a different result in the proceedings. Petitioner's assertions fail both portions of the *Strickland* test.

(D.E. 4-11, at 19–20.) The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.

As to the first prong, deficient performance, the PCR court observed that the trial record refuted Petitioner's claim that Juror #6 had not disclosed that she was a victim of a crime. (*Id.* at 19.)  Additionally, Petitioner failed to explain why he believed that Juror #6 "had associated with people who had criminal records," or why exactly counsel should have moved to excuse on that basis.  (*Id.* at 20.)  Under the second prong, prejudice, Petitioner failed to explain how striking Juror #6 would have "produced a different result in the proceedings." (*Id.*)  In his Petition, Petitioner does not elaborate on these allegations. (D.E. 1, at 34–35.)  Consequently, the Appellate Division, in adopting the PCR court's reasoning, reasonably applied both prongs of *Strickland*, and Petitioner is not entitled to habeas relief under Ground Seven (D).

### 4. Ineffective Assistance of Counsel in Advising Petitioner Regarding His Sentencing Exposure

Next, under Ground Ten, Petitioner contends that trial counsel was ineffective because counsel never advised him of "the range of penal consequences he faced if convicted." (D.E. 1, at 37–38.)  In his PCR briefing, Petitioner argued that counsel never advised him "that he was subject to an extended term."  (D.E. 4-9, at 10.)  Petitioner alleges that if he was aware of that information, he would have taken the plea offer of twelve years. (*Id.*)  Similarly, in Ground Eight, Petitioner argues that appellate counsel was ineffective for failing to argue that "the trial court failed to notify petitioner at the pre-trial conference that he was subject to an extended term."  (D.E. 1, at 35–36.)

The last reasoned state court decision with respect to these claims is the Appellate Division's opinion on PCR appeal, which affirmed for substantially the same reasons as set forth in the PCR court's opinion and added the following:

> The judge also rejected defendant's claim that trial counsel failed to adequately advise him of his sentence exposure, thereby negatively influencing defendant's decision to reject a more favorable plea offer. The judge noted defendant executed a pretrial memorandum that clearly stated he was eligible for an extended term.
>
> Defendant contends the pre-trial memorandum was "an insufficient basis" upon which to deny his IAC claim. However, the pre-trial memorandum directly negated defendant's assertions in his PCR petition that he was "never informed . . . he was subject to an extended term of imprisonment," and that "the failure to inform [defendant] of the same during pre-trial conference removed what would have been the last opportunity to enter a plea agreement." Accordingly, there was no need to hold an evidentiary hearing.

*Pierrevil*, 2018 WL 1004063, at *3.  In denying Petitioner's claims, the PCR court held that

> Petitioner alleges that trial counsel never informed Petitioner that he was extended-term eligible until the time of his sentencing and that this failure to inform precluded Petitioner from meaningfully considering a twelve-year plea deal.

R. 3:9-1(e) requires the trial court to conduct a pretrial conference in open court with the prosecutor, defense counsel and the defendant present. During the pretrial conference, the court must determine, *inter alia*, whether the defendant understands the State's final plea offer, if one exists, and the sentencing exposure for the offenses charged, if convicted. R. 3:9-1(e).

To assess Petitioner's claim, the Court relies on a pretrial memorandum form submitted by the State. On August 24, 2010, Petitioner completed a pretrial memorandum form signed by the prosecutor, defense counsel, and this Court. Petitioner signed each page of this memorandum. Page 1, Question 2 reads: "Does the defendant qualify for extended term?" An answer of "Yes" is circled on the form and a checkmark indicates that the extended term was mandatory. Petitioner's claim that "he was not made aware until sentencing, that he faced the prospect of an extended sentencing such that the sentence would potentially be longer than he was aware off,]" is contradicted entirely by his completion of the pretrial memorandum more than a year before his sentencing on September 30, 2011. With respect to *Strickland's* second prong, Petitioner makes only a bare assertion that the results of the proceedings would have been different had he known about the existence of an extended term. He offers no specific reasons as to why he would have elected not proceed to trial had he known about his extended-term eligibility.

Petitioner's claim is unavailing and the first and second *Strickland* prongs have not been met here.

. . .

Petitioner asserts that his appellate attorney was ineffective in that he failed to argue on direct appeal that the trial court and trial counsel failed to notify Petitioner that he was extended term eligible. See Section l.A.i (describing Petitioner's argument on this point regarding trial counsel). This Court is not convinced that, had this issue been addressed on appeal, the result of the proceedings would have been any different. As this Court has already made clear in the foregoing analysis, Petitioner's allegation of ineffective assistance of trial counsel on this point lacks merit and falls substantially short of the *Strickland* standard.

(D.E. 4-11, at 14–15, 22 (footnotes omitted).)  With those decisions in mind, Petitioner has not

shown that the state court unreasonably applied either of the *Strickland* prongs.

As to the first prong, deficient performance, the Appellate Division noted that Petitioner specifically signed each page of the pretrial memorandum, including the page that advised him that he was subject to an extended term. (D.E. 4-11, at 14–15); *Pierrevil*, 2018 WL 1004063, at *3. Consequently, the court found that the "memorandum directly negated defendant's assertions . . . that he was 'never informed . . . [that] he was subject to an extended term of imprisonment,' and that 'the failure to inform [him] . . . during [the] pre-trial conference removed what would have been the last opportunity to enter a plea agreement.'" *Pierrevil*, 2018 WL 1004063, at *3.

This Court must presume that the state court's factual determinations were correct unless Petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El*, 545 U.S. at 240.  In his Petition, Petitioner does not appear to contest that he signed the pretrial memorandum or that it advised him that he was extended term eligible. (D.E. 1, at 36, 38.) Instead, he now appears to argue that he would have preferred some unspecified, additional advice regarding his sentencing exposure. (*Id*.)  Accordingly, this Court finds that Petitioner has failed to rebut the presumption of correctness by clear and convincing evidence.  As a result, the Appellate Division reasonably concluded that Petitioner failed to demonstrate that counsel's performance was deficient, *i.e.*, that counsel had never advised Petitioner that he was subject to an extended term.

Turning then to the second prong, prejudice, the Appellate Division, in adopting the  PCR court's reasoning, held that Petitioner's "bare assertion that the results of the proceedings would have been different had he known about the existence of an extended term," was insufficient to establish *Strickland* prejudice. (D.E. 4-11, at 14–15.)  As the PCR court explained, Petitioner "offer[ed]  no specific reasons as to why he would have elected not proceed to trial had he known about his extended-term eligibility." (*Id*.)  This Court agrees that Petitioner's bare assertion was

insufficient and finds that the Appellate Division reasonably concluded that Petitioner failed to establish *Strickland* prejudice.

Similarly, as Petitioner's claim regarding his extended term eligibility lacked factual merit, the Appellate Division reasonably held that appellate counsel was not ineffective for failing to raise a meritless claim. *See Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.") (citation omitted).  For all those reasons, Petitioner has failed to show that the Appellate Division unreasonably applied either prong of *Strickland*, and he is not entitled to habeas relief on Grounds Eight and Ten.

## 5. Ineffective Assistance of Counsel for Failing to Move to Dismiss the Indictment

Finally, under Ground Eleven, Petitioner contends that counsel was ineffective for failing to move to dismiss the indictment. (D.E. 1, at 39.)  In Petitioner's view, the prosecutor's failure to address Mr. Mann's inconsistent identifications before the grand jury warranted dismissal of the indictment. (*Id*.)  As mentioned above, Mr. Mann initially indicated that he could identify the suspects and identified Petitioner from a photo array. *Pierrevil*, 2018 WL 1004063, at *1 n.3.  At the grand jury proceedings and trial, however, Mr. Mann did not identify either defendant and claimed that both wore ski masks during the incident. *Id*.  Additionally, Petitioner contends that his appellate counsel failed to raise the issue on direct appeal. (D.E. 1, at 39.)

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on PCR appeal, which affirmed for substantially the same reasons as set forth in the PCR court's opinion. *Pierrevil*, 2018 WL 1004063, at *3.  The PCR court had ruled that

> Petitioner argues that his trial counsel, Mr. Michael Robbins, was ineffective because he failed to file a motion to dismiss the indictment based on the prosecutor's duty to disclose exculpatory evidence during the grand jury proceedings.

A motion to dismiss the indictment is addressed to the discretion of the trial court. *State v. New Jersey Trade Waste Ass'n*, 96 N.J. 8, 18 (1984). This discretion should not be exercised except on the "clearest and plainest ground" and an indictment should stand "unless it is palpably defective." *Id*. at 18-19 (citations omitted).

When presenting a case to the grand jury, "a prosecutor enjoys broad discretion" with a presumption of validity. *State v. Smith*, 269 N.J. Super. 86, 92 (App. Div. 1993) (citing *State v. Perry*, 124 N.J. 128, 167-168 (1991)). However, "a defendant with substantial grounds for having an indictment dismissed should not be compelled to go to trial to prove the insufficiency." *State v. Granziani*, 60 N.J. Super. 1, 22 (App. Div. 1959).

In New Jersey, a prosecutor's duty before the grand jury arises "only if the evidence satisfies two requirements: it must directly negate guilt and must also be clearly exculpatory." *State v. Hogan*, 144 N.J. 216, 237 (1996). The first requirement under *Hogan*—direct negation of guilt—means that "unless the exculpatory evidence at issue squarely refutes an element of the crime in question, that evidence is not within the prosecutorial duty we have set forth." *Id*. at 237. The second *Hogan* requirement—clearly exculpatory evidence—considers  an evaluation of the quality and reliability of the evidence. *Id*.  This prong should be analyzed in "the context of the nature and source of the evidence, and the strength of the State's case." *Id*. at 237-238.

Petitioner alleges that the prosecutor failed to disclose to the grand jury that the victim[,] Mr. Mann had previously told Officer Michael Walker he could identify the individuals who assaulted him.  During a photo identification procedure on October 15, 2008, Mr. Mann identified Petitioner and Emmanuel Pierrevil as the perpetrators of the assault. . . . On January 15, 2009, before the grand jury, Mr. Mann testified that the assailants wore ski masks.

Petitioner alleges that, because Mr. Mann testified during grand jury proceedings that the perpetrators wore ski masks, the prosecutor had an obligation to pose questions about Mr. Mann's conflicting prior identification on October 15, 2008.  Petitioner's allegations do not implicate the prosecutor's duty to disclose exculpatory evidence. Since Mr. Mann positively identified Petitioner to Officer Walker, the October 15, 2008 photo identification did not in any way exculpate Petitioner.  Introducing this evidence to the grand jury would not have directly negated an element of the crime; instead, such an identification would have only solidified Petitioner's identity and presence at the scene and served to inculpate Petitioner.

> This evidence does not directly negate guilt nor is it clearly
> exculpatory. Because trial counsel had no basis for filing a motion
> to dismiss the indictment, his performance was not deficient and
> prong one of the *Strickland* test has not been met here.

(D.E. 4-11, at 16–17 (footnotes omitted) (citations omitted).) For the same reasons, the PCR court

denied Petitioner's claim that appellate counsel was ineffective for failing to raise this issue on

direct appeal. (*Id*. at 22.) The state court's decisions were not contrary to, or an unreasonable

application of, clearly established federal law.

Because there is no federal right to a state criminal grand jury process, defects in a grand

jury proceeding that result in an indictment are not generally challengeable in habeas cases absent

some other basis for finding a constitutional violation. *E.g.*, *Wainwright v. Goode*, 464 U.S. 78, 86

(1983); *Yough v. Lord*, No. 19-601, 2020 WL 6689854, at *9 (D.N.J. Nov. 13, 2020); *Potter v.

Att'y Gen. of New Jersey*, No. 15-8784, 2018 WL 3201799, at *7 (D.N.J. June 29, 2018). Further,

under most circumstances, "a subsequent guilty verdict from a petit jury" will render harmless any

alleged defect before the grand jury. *Yough*, 2020 WL 6689854, at *9; *see also United States v.

Mechanik*, 475 U.S. 66, 72–73 (1986); *United States v. Console*, 13 F.3d 641, 672 (3d Cir. 1993)

(finding that with the exception of a claim of racial discrimination in the selection of grand jurors,

a "petit jury's guilty verdict render[s] any prosecutorial misconduct before the indicting grand jury

harmless").

Applying those principles here, assuming *arguendo* that the prosecutor should have raised

Mr. Mann's prior identification to the grand jury—which inculpated Petitioner—the petit jury's

subsequent guilty verdict "cured any defect in the grand jury proceeding and rendered any

misconduct harmless." *United States v. Solomon*, No. 05-0385, 2013 WL 869648, at *7 (W.D.

Pa. Mar. 7, 2013) (quoting *United States v. Muhammad*, 336 F. App'x 188, 193 (3d Cir. 2009)).

As the Supreme Court explained in *Mechanik*, even if deficiencies affected the grand jury's decision to indict,

> the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Mechanik*, 475 U.S. at 70.

Because Mr. Mann's identification *inculpated* Petitioner and did not negate any element of the offense, state law did not require the prosecutor to present that evidence to the grand jury. (D.E. 4-11, at 16–17.)  Consequently, the state court reasonably concluded that Petitioner had failed to show that counsel's performance was deficient under *Strickland*.

Although the state court did not address *Strickland* prejudice, Petitioner cannot demonstrate that he suffered prejudice in this context.  Stated differently, because the petit jury's verdict rendered the alleged grand jury error harmless, Petitioner cannot show that he suffered prejudice under *Strickland*.  Taken together, Petitioner has failed to demonstrate that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on Ground Eleven.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Petitioner has not made a substantial showing of a denial of a constitutional right. Accordingly, this Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the foregoing reasons discussed, the Court will deny the Petition and will not issue a certificate of appealability.  An appropriate Order accompanies this Opinion.

Dated: June 30, 2022

JOHN MICHAEL VAZQUEZ
United States District Judge